974 So.2d 1034 (2006)
Farrell BEDSOLE
v.
STATE of Alabama.
CR-04-2140.
Court of Criminal Appeals of Alabama.
December 20, 2006.
Rehearing Denied June 29, 2007.
*1035 A. Riley Powell IV, Andalusia, for appellant.
Troy King, atty. gen., and Stephen N. Dodd, asst. atty. gen., for appellee.

On Return to Remand[*]
PER CURIAM.
The appellant, Farrell Bedsole, was convicted of first-degree sodomy and first-degree sexual abuse, for offenses committed against K.W., and second-degree sodomy and second-degree sexual abuse, for offenses committed against A.W.[1] Bedsole was sentenced to life imprisonment on the first-degree-sodomy charge, 10 years' imprisonment on the first-degree-sexual-abuse charge, 20 years' imprisonment for the second-degree-sodomy charge, and 1 year of imprisonment for the second-degree-sexual-abuse charge. Bedsole was also ordered to pay $500 to the Victims' Compensation Fund, in accordance with § 15-23-17(b), Ala.Code 1975, and $100 to the Alabama Forensic Services Trust Fund, in accordance with § 36-18-7, Ala. Code 1975.[2]
Bedsole does not challenge the sufficiency of the State's evidence; therefore we will give only a brief rendition of the facts presented by the State at Bedsole's trial.
A.W. testified that she first met Bedsole when she and her mother lived across the street from him. She was friends with Bedsole's daughter. A.W. said that when she was 12 years old Bedsole started touching her inappropriately. Bedsole would come up behind her, she said, when she was working at a computer and would put his hands down the front of her blouse and touch her. She said that she moved in with Bedsole for a short period when she was 15 years old because she was having difficulties at school. He started touching her more frequently, she said, almost every night. Bedsole would come to her bed in the middle of the night, A.W. said, and would push away her clothes and touch her breasts and vagina with his hands and mouth. She said that she asked him to stop; she said he told her that she brought his actions on herself and that it did not matter because she was not a virgin.
The second victim, K.W.,[3] testified that at one point she lived with her mother and Bedsole and that she later moved in with Bedsole when she began having difficulties with her mother. K.W. said that when she was 16 years old Bedsole would touch her breasts and vagina, put his mouth on her breasts and vagina, and put his fingers in her vagina. She said that when she was living with him he awakened her in the middle of the night, pushed her pants down, and put his penis in her vagina. She said that he had sexual intercourse with her against her will on one other occasion while she was living with him.

I.
Bedsole argues that the trial judge erred by allowing Eugenia Loggins, the *1036 former district attorney for the Twenty-Second Judicial Circuit, to testify regarding K.W.'s demeanor during her grand-jury testimony. Loggins was the district attorney for Covington County when Bedsole's case was presented to the grand jury. At the time of Bedsole's trial Loggins was no longer the district attorney and was engaged in the private practice of law.
The record shows that K.W. testified that she first told police that Bedsole had not done anything to her but when she was testifying before the grand jury she broke down after being repeatedly told to tell the truth, and she stated that Bedsole had sexually abused her. During K.W.'s cross-examination, the following occurred:
"Q. [Defense counsel]: What about the district attorney's investigator, Gary Hutcheson? Did he ever speak with you before your  First off, do you know who I'm talking about? Gary Hutcheson?
"A. [K.W.]: I think so.
"Q. The one whose office is right over here?
"A. Yes, sir.
"Q. Now, did you have conversations with him before your grand jury testimony?
"A. No, sir.
"Q. You didn't have anything like that?
"A. Not that I remember.
"Q. Who was it that kept telling you to  remember, you're under oath, remember, you're under oath?
"A. It was the lady.
"Q. Ms. Loggins?
"A. Yes, sir.
"Q. And that's the first time you decided to say anything about Farrell [Bedsole]?
"A. Yes, sir.
"Q. And that's when Ms. Loggins was there and there were eighteen people in the jury box?
"A. Yes, sir."
(R. 324-25.)
The State then called Loggins to testify. Before allowing her testimony, the circuit court held an in-depth discussion outside the jury's presence. It is clear that the State intended to limit Loggins's testimony to K.W.'s demeanor during her grand-jury testimony and that is why the circuit court allowed Loggins's testimony.
Loggins testified that K.W. was initially reserved but that she broke down near the end of her grand-jury testimony. Loggins said that K.W. was
"Very emotional. It was very sudden. All of a sudden her entire demeanor changed. She just suddenly began to cry. And I realized that the facade was gone. And then she told us what had happened to her. And she continued to be emotional, continued to  not cry profusely but gathered herself, but she continued to be very distraught and very upset."
(R. 447.)
During defense counsel's cross-examination of Loggins, counsel elicited the following testimony:
"Q. [Defense counsel]: Are you still  Let me ask this: Do you know Farrell Bedsole?
"A. [Loggins]: Not personally. No.
"Q. Do you know him through your office?
"A. All I know him is through this case.
"Q. And you don't like him, do you?
"A. I don't like what he did.
"Q. You don't like what he is accused of doing; isn't that correct?

*1037 "A. That's correct."
(R. 454.)
Bedsole argues that the circuit court committed reversible error by allowing Loggins's testimony for several reasons. Specifically, Bedsole argues that her testimony should have been excluded because of Loggins's position as the district attorney, that Loggins should not have been allowed to express a personal opinion concerning Bedsole's guilt, and that Loggins's testimony improperly bolstered the State's case against Bedsole.
Initially, we note that Loggins's direct testimony consisted of merely six pages of the trial transcript and was in large part cumulative to K.W.'s own testimony.
"Testimony that is inadmissible may be rendered harmless by prior or subsequent lawful testimony to the same effect or from which the same facts can be inferred. McFarley v. State, 608 So.2d 430, 433 (Ala.Crim.App.1992). `The erroneous admission of evidence that is merely cumulative is harmless error.' Dawson v. State, 675 So.2d 897, 900 (Ala.Crim.App.1995)."
Tinker v. State, 932 So.2d 168, 188 (Ala. Crim.App.2005).
Bedsole argues that Loggins's remark that she did not like what Bedsole was accused of doing amounted to improper vouching on the part of the district attorney. The United States Supreme Court in United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), specifically condemned a prosecutor's vouching for the credibility of a witness or expressing a personal opinion concerning a defendant's guilt. The United States Supreme Court stated:
"The prosecutor's vouching for the credibility of witnesses and expressing his personal opinion concerning the guilt of the accused pose two dangers: such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence."
470 U.S. at 18-19, 105 S.Ct. 1038. See also United States v. Sims, 719 F.2d 375, 377 (11th Cir.1983) ("`Attempts to bolster a witness by vouching for his credibility are normally improper and error.'" (quoting United States v. Ellis, 547 F.2d 863, 869 (5th Cir.1977))). Bedsole argues that based on the holdings in Young and Sims, his conviction should be reversed.
We note that the challenged testimony was elicited during defense counsel's cross-examination of Loggins. Accordingly, if any error did occur, it was invited by defense counsel's own actions. "`Under the doctrine of invited error, an appellant cannot voluntarily invite error by his own conduct and then seek to profit thereby.' Kirkland [v. State], 581 So.2d [1207,] at 1210 [(Ala.Crim.App.1990)] (citing Timmons v. State, 487 So.2d 975 (Ala.Cr.App. 1986))." Mack v. State, 736 So.2d 664, 671 (Ala.Crim.App.1998).
Moreover, we cannot agree with Bedsole's characterization of the above testimony as "improper vouching" on the part of the district attorney. Loggins was not the district attorney at the time of trial but was called as a witness to describe K.W.'s demeanor during her grand-jury testimony when she first revealed the abuse she said she suffered from Bedsole. The fact that Loggins related to the jury that K.W. cried during her grand-jury testimony and *1038 that Loggins did not like what Bedsole was accused of doing in no way suggests that Loggins was vouching for the State's evidence or expressing an opinion concerning Bedsole's guilt. The cases relied on by Bedsole have no application here.
Lastly, if error did occur it was harmless beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).
"In holding that the harmless-error rule governs even constitutional violations under some circumstances, the Court recognized that, given the myriad safeguards provided to assure a fair trial, and taking into account the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect trial, and that the Constitution does not guarantee such a trial."
United States v. Hasting, 461 U.S. 499, 508-09, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983) (footnote omitted). For the reasons stated, we find no reversible error.

II.
Bedsole also argues that the trial court erred by allowing the testimony of L.D. to be received into evidence. Specifically, L.D. testified that when she was about 15 years old she lived with Bedsole and she awoke one night to find Bedsole standing over her bed with his hands inside her underwear. Bedsole argues that L.D.'s testimony was not admissible under Rule 404(b), Ala. R. Evid., and that its probative value was greatly outweighed by its prejudicial impact.
Rule 404(b), Ala.R.Evid., states:
"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial."
The State specifically argued at trial that L.D.'s testimony was admissible to show Bedsole's motive. In addressing the admissibility of collateral acts of sexual abuse in the trial of a defendant charged with rape and sexual abuse, this Court in Estes v. State, 776 So.2d 206 (Ala.Crim. App.1999), stated:
"Ordinarily, a prior act of sexual abuse would be inadmissible under Rule 404(b). However, in this case, the alleged prior bad act was offered for the specific purpose of proving motive.
"`"Motive is defined as `an inducement, or that which leads or tempts the mind to do or commit the crime charged.' Spicer v. State, 188 Ala. 9, 11, 65 So. 972, 977 (1914). Motive has been described as `that state of mind which works to "supply the reason that nudges the will and prods the mind to indulge the criminal intent."' [Charles Gamble, Character Evidence: A Comprehensive Approach 42 (1987).]
"`"Furthermore, testimony offered for the purpose of showing motive is always admissible. McClendon v. State, 243 Ala. 218, 8 So.2d 883 (1942). Accord, Donahoo v. State, 505 So.2d 1067 (Ala.Cr.App.1986). `"It is permissible in every criminal case to show that there was an influence, an inducement, operating on the accused, which may have led or tempted him to commit the offense." McAdory v. State, 62 Ala. 154 [(1878)].' Nickerson *1039 v. State, 205 Ala. 684, 685, 88 So. 905, 907 (1921)."'
"Hatcher v. State, 646 So.2d 676, 679 (Ala.1994) (emphasis added).
"In determining whether evidence concerning a collateral act of sexual abuse is admissible to prove motive, we must consider the following factors: `"(1) the offense(s) charged; (2) the circumstances surrounding the offense(s) charged and the collateral offense(s); (3) the other collateral evidence offered at trial, and (4) the other purpose(s) for which it is offered.'" Campbell v. State, 718 So.2d 123, 130 (Ala.Cr.App.1997), quoting Bowden v. State, 538 So.2d 1226, 1237 (Ala.1988).
"First, Estes was charged with rape and sexual abuse in the first degree as to M.K.B. Second, the circumstances surrounding the charged offenses and the collateral sexual offense are virtually identical, i.e., both victims are female and in the same age category, and both the charged offense and the collateral offense occurred in Estes's pickup truck in an identical manner. Estes placed his right arm around M.K.B. and L.L. Then, he placed his right hand down their shirts and rubbed their breasts while he rubbed their thighs with his left hand. Third, no other collateral evidence was offered at the trial. Fourth, the State did not offer the collateral offense in order to establish that Estes acted in conformity on this particular occasion. Rather, the State offered the evidence to establish Estes's motive in committing the charged offense.
"In this case, the offenses committed by Estes are so similar that a jury could have concluded that Estes is motivated by an unnatural sexual desire for young girls. See Worthy v. State, 724 So.2d 55 (Ala.Cr.App.1998); Hatcher. We find that the probative value of the evidence of the collateral offense outweighed its prejudicial effect. Therefore, we cannot say that the trial court abused its discretion in admitting the collateral evidence. Allen v. State, 624 So.2d 650, 653-54 (Ala.Cr.App.1993); see also Worthy v. State, 724 So.2d 55 (Ala.Cr.App.1998) (holding that collateral sexual offense was similar to the present offense, and therefore, that evidence of that collateral offense was relevant to show motive); Campbell v. State, 718 So.2d 123 (Ala.Cr. App.1997); Ex parte Register, 680 So.2d 225 (Ala.1994) (holding that collateral evidence was admissible because the evidence tended to show that the appellant had a propensity for unusual sexual relations); Hatcher."
776 So.2d at 210-211.
Similarly, in Ritchie v. State, 808 So.2d 71 (Ala.Crim.App.2001), two brothers, ages eight and nine, were sexually abused by a neighbor. The evidence showed that Ritchie had the boys sit on his lap and he unzipped their pants and touched them. At trial, the State introduced the testimony of another individual, K.D.J., who testified that when she was eight years old Ritchie sat next to her, put his arm around her, and rubbed his hand between her legs. Another witness, K.B.W., testified that when she was 10 years old Ritchie put her on his lap and rubbed her legs and underneath her shirt. In affirming the trial court's admission of evidence of the collateral acts of sexual abuse committed against K.D.J. and K.B.W., this Court stated:
"Although the victims in the present case were males and the victims of the prior acts were females, the acts of abuse shared many similarities. All of the victims were between eight and ten years of age. Furthermore, all of the victims testified that they were in a living room when the appellant touched *1040 them. K.D.J., J.S.S., and Z.A.S. testified that the appellant touched their genital areas, and K.D.J. and J.S.S. testified that there were other people in the same room watching television when the appellant touched them. Additionally, at the time of the offense, L.B.W., like J.S.S. and Z.A.S., lived in the same trailer park as the appellant and was at the appellant's trailer playing with his sons when the abuse occurred. Finally, L.B.W., J.S.S., and Z.A.S. all testified that they were sitting in the appellant's lap at the time the appellant touched them. Even though the prior acts of abuse were not identical to the acts of abuse in the present case, they were sufficiently similar to show that the appellant's motive for sexually abusing J.S.S. and Z.A.S. was his unnatural desire for young children. See Ex parte Register, 680 So.2d 225 (Ala.1994); Estes [v. State, 776 So.2d 206 (Ala.Crim. App.1999)]; Atkisson v. State, 640 So.2d 33 (Ala.Crim.App.1993). Therefore, the appellant's argument is without merit."
Ritchie, 808 So.2d at 75.
In this case, A.W. and K.W. both testified that Bedsole came to their beds in the middle of the night while they were asleep in Bedsole's house and touched their breasts and vaginas. L.D. similarly testified that while she was staying at Bedsole's residence she awoke to find Bedsole next to her bed with his hand down her underwear. As we stated in Estes, "[T]he offenses committed by [Bedsole] are so similar that a jury could have concluded that [Bedsole] is motivated by an unnatural sexual desire for young girls." 776 So.2d at 211.
Bedsole also argues that L.D.'s testimony should have been excluded because the incident was too remote  it occurred more than 10 years before the charged offenses. We do not agree.
"Neither the Alabama Rules of Evidence nor Alabama caselaw sets a specific time limit for when a collateral act is considered too remote, other than a conviction for impeachment purposes." McClendon v. State, 813 So.2d 936, 944 (Ala.Crim.App. 2001); see also C. Gamble, Gamble's Alabama Rules of Evidence, § 404(b) (2d ed.2002). Rule 609(b), Ala. R. Evid., specifically provides that a conviction that is more than 10 years old is not admissible for impeachment purposes unless the trial court determines "that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect." Rule 609(b) has no application to the admission of collateral acts to establish motive.
Moreover, the determination of whether a prior bad act is too remote is made on a case-by-case basis and is left to the sound discretion of the trial judge, and the judge's determination will not be disturbed on appeal unless the judge has abused his discretion. McClendon, supra. The remoteness, if any, of L.D.'s testimony affected the weight and probative value the jury placed on it, not its admissibility. The circuit court correctly allowed L.D. to testify concerning collateral acts of sexual abuse committed by Bedsole.
For the foregoing reasons, Bedsole's convictions and sentences are due to be, and are hereby, affirmed.
AFFIRMED.
McMILLAN, P.J., and BASCHAB, SHAW, and WISE, JJ., concur; COBB, J., concurs in part and dissents in part, with opinion.
COBB, Judge, concurring in part and dissenting in part.
While I concur with the majority in Part II that the testimony of L.D. was properly *1041 received by the trial court, I respectfully dissent from the majority as to its holding in Part I relating to the testimony of Eugenia Loggins.
Over 70 years ago, the United States Supreme Court delivered these words of wisdom:
"The [prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigorindeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."
Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). Because I am of the opinion that the testimony of Eugenia Loggins was a "foul blow" that could have created undue prejudice in the minds of jurors, I believe Bedsole's convictions should be reversed and the case remanded for a new trial.
The majority opinion of this Court states that if it was error for the trial court to allow the testimony of Loggins, it was harmless error. The record clearly shows that the Loggins's direct testimony was inadmissible hearsay that should have never been permitted by the trial judge. The State offered Loggins as a witness solely because on cross-examination Bedsole's counsel had questioned K.W. regarding her initial assertion that Bedsole had not sexually abused her.
Rule 801(d)(1)(B), Ala. R. Evid., states:
"A statement is not hearsay if . . . [t]he declarant testifies at trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive."
However, as this Court has noted, "to circumvent a hearsay objection and to obtain admissibility under Rule 801(d)(1)(B), the prior consistent statements must have been made before the witness is claimed to have acquired a motive to fabricate." Freeman v. State, 722 So.2d 806, 812 (Ala. Crim.App.1998). In other words, the declarant would first make a statement, then make a fabricated statement, and then revert to his or her original account. The State, however, offered testimony regarding a statement made after K.W. gave a purported fabricated account and after K.W.'s encounter with Bedsole, which would have given her a motive to fabricate her story. As the State admits in its brief, Loggins's testimony does not fall within the ambit of Rule 801(d)(1)(B) and thus it was error for the trial court to allow Loggins to testify.
I disagree with the majority opinion of this Court that allowing Loggins's testimony was harmless error. Rule 403, Ala. R. Evid., states:
"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."
*1042 While the relevancy of Loggins's testimony must be questioned, the prejudice and bias her testimony could have created in the minds of the jurors are grounds for reversal. For 18 years, Eugenia Loggins served as the district attorney for the Twenty-Second Judicial Circuit, a circuit consisting solely of Covington County. On three occasions the people of Covington County elected Loggins as their district attorney. To place Loggins's longevity in perspective, the citizens of Covington County first elected Loggins their district attorney two years before the trial judge in this matter was even admitted to practice law in Alabama. The majority appears to place much credence on the fact that Loggins was no longer the district attorney and was in private practice at the time of the trial. However, Loggins is also a supernumerary district attorney. Furthermore, one's esteem with the public does not always diminish upon retirement, as evidenced by such individuals as Bear Bryant, Shug Jordan, Gene Stallings, and Pat Dye.
Covington County is typical of rural Alabama where everyone knows each other and elected officials are typically held in high regard. To have the highly regarded retired district attorney testify, "I don't like what he did," obviously creates the danger of undue prejudice, which substantially outweighs any relevancy the testimony may have had.
The Alabama Supreme Court has previously held that testimony by an elected official closely associated with a case is grounds for reversal and remand for a new trial. In Chancellor v. State, 291 Ala. 413, 282 So.2d 242 (1973), the Cherokee County sheriff served as bailiff to the jury during a trial in which he testified. The Supreme Court held this to be reversible error that warranted a new trial. In reversing the judgment and remanding the case in Chancellor, the Supreme Court noted:
"`It is established that in their deliberations the jury should be separated from and uninfluenced by the outside world. Any misconduct that might influence the jury, affect the verdict rendered or the punishment fixed, is a cause for a new trial. The test of vitiating influence upon a jury authorizing a new trial is not whether it did influence the jury to act without the evidence, but whether it might have unlawfully influenced the jury in the verdict returned, as to its nature, character, or degree, or the amount and extent of the punishment fixed by the jury within the statute.'"
291 Ala. at 415, 282 So.2d at 244, quoting Oliver v. State, 232 Ala. 5, 166 So. 615, 617 (1936).
At least one other court faced with an identical situation has concluded that the testimony of the former prosecutor constituted reversible error. In United States v. McKoy, 771 F.2d 1207 (9th Cir.1985),[4] a codefendant of McKoy who testified against McKoy was cross-examined extensively regarding his plea agreement. In response, the prosecutor called the former prosecutor who handled the plea negotiations concerning the codefendants to clarify the circumstances surrounding the plea bargain. The former prosecutor's testimony was characterized as follows:

*1043 "[The former prosecutor] began by explaining the terms of [a co-defendant's] plea agreement to the jury. The trial prosecutor then asked [the former prosecutor] to describe his negotiations with [the co-defendants]. [The former prosecutor] responded:
"`In answering your question, I am going to have to tell you what my state of mind was with regard to this. I wanted to make sure that we had as good a case as we possibly could going into the courtroom. I felt that at that time the Government had an excellent case against'
"At that point, the defense objected to the former prosecutor's discussion of his opinion of the evidence. The court sustained the objection, but permitted the witness to describe his `state of mind' with respect to the negotiations. The former prosecutor then continued his testimony as follows: 'I felt the case was an extremely strong case against all defendants. It was stronger against some defendants than others, but nonetheless, I felt it was a strong case.' [The former prosecutor] went on to tell the court that `[one of the codefendants], in my view, was least culpable of all'. Defense counsel asserted a continuing objection to this testimony, and moved for a mistrial. The motion was denied."
771 F.2d at 1210 (footnote omitted). In determining that the former prosecutor's testimony was improper, the Ninth Circuit observed:
"The rule that a prosecutor may not express his personal opinion of the defendant's guilt or his belief in the credibility of witnesses is firmly established. E.g. United States v. Potter, 616 F.2d 384, 392 (9th Cir.1979), cert. denied 449 U.S. 832, 101 S.Ct. 101, 66 L.Ed.2d 37 (1980); United States v. Davis, 564 F.2d 840, 866[846] (9th Cir.1977), cert. denied, 434 U.S. 1015, 98 S.Ct. 733, 54 L.Ed.2d 760 (1978). Although the problem of prosecutorial vouching generally arises during arguments to the jury, it is equally objectionable where a prosecutor speaks to the jury as a witness. See People v. Arends, 155 Cal.App.2d 496, 318 P.2d 532 (1958)."
771 F.2d at 1210-11.
After determining that the prosecution had engaged in improper conduct, the Ninth Circuit then analyzed whether the improper conduct amounted to prejudice. The court first noted that the prosecution's case depended on the credibility of its two chief witnesses. The court then noted:
"The fact that the improper statements here were presented to the jury as sworn testimony reinforces our conclusion that those statements probably affected the jury's ability to judge the evidence fairly. We have often noted that the trial court may be able to `neutralize' the effect of improper prosecutorial remarks by admonishing counsel to refrain from such remarks or by giving appropriate curative instructions to the jury. E.g. United States v. Mikka, 586 F.2d 152, 156 (9th Cir.1978), cert. denied 440 U.S. 921, 99 S.Ct. 1247, 59 L.Ed.2d 474 (1979). But prejudicial statements by the prosecution usually come before the jury during opening or closing argument. In such cases, the prosecutor's remarks are not evidence, and the jury is so instructed. The jury is further instructed to consider only the evidence in reaching its verdict. In the present case, the prosecutor's remarks were evidence, presented to the jury as sworn testimony."
771 F.2d at 1212-13.
Likewise, the State's case against Bedsole hinged exclusively on the credibility of A.W. and K.W. No physical evidence was presented connecting Bedsole to the alleged *1044 sexual abuse. As in McKoy, the former prosecutor's statement regarding her opinion about Bedsole's guilt was evidence, presented as sworn testimony. Thus, it would have been extremely difficult, if not impossible, for the trial court to "neutralize" the effect of this improper prosecutorial comment with a curative instruction.
The majority attempts to diminish the severity of Loggins's statement, "I don't like what he did," by contending that because the statement was made during cross-examination it was invited error. An invited error is one that is invited by the defendant or was a natural consequence of the defendant's actions. Moody v. State, 888 So.2d 532 (Ala.Crim.App.2003). To say that Loggins's statement was invited error is disingenuous. In an attempt to show any bias on the part of Loggins, Bedsole's attorney asked her if it was not true that she did not like his client. Instead of answering yes or no, Loggins expressed her opinion as to Bedsole's guilt by stating "I don't like what he did." Obviously Bedsole's attorney was not expecting such a response, and the response was not a natural consequence of his attorney's question. Plainly, this is not invited error.
"`The test of vitiating influence upon a jury authorizing a new trial is not whether it did influence the jury to act without the evidence, but whether it might have unlawfully influenced the jury in the verdict returned, as to its nature, character, or degree. . . .'" Chancellor v. State, 291 Ala. at 415, 282 So.2d at 244. It is my opinion that in a case that depended solely on the credibility of the two victims, the testimony of the popular former district attorney regarding the circumstances surrounding when one of the victims changed her story so as to accuse Bedsole of sexually abusing her and the former district attorney's statement implying that she believed that Bedsole was guilty of the crimes charged, "`might have unlawfully influenced the jury in the verdict returned.'" Id. Therefore, I believe the proper course of action by this Court would be to reverse the judgment of the trial court and remand this case for a new trial. I therefore dissent from that portion of the majority's opinion.
NOTES
[*] Note from the reporter of decisions: On July 13, 2006, the Court of Criminal Appeals remanded the case by order; the case was resubmitted on return to remand on August 2, 2006.
[1] To protect the anonymity of the juvenile victims, we have used their initials. See Rule 52, Ala.R.App.P.
[2] On July 13, 2006, we remanded this case for the circuit court to vacate that portion of its sentencing order assessing a $100 fine to the Alabama Forensic Services Trust Fund because Bedsole was not convicted of any offenses enumerated in §§ 13A-12-211 through 13A-12-260, Ala.Code 1975.
[3] Although both victims share the same last initial there is no indication that they are related; both have different last names.
[4] While I do not always agree with the decisions of the United States Court of Appeals for the Ninth Circuit, e.g., Newdow v. U.S. Congress, 328 F.3d 466 (9th Cir.2003), rev'd Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004) (declaring recitation of the Pledge of Allegiance in public classrooms a violation of the Establishment Clause), I believe the holding and reasoning of the Ninth Circuit's in McKoy is correct.