PER CURIAM.
Kevin Andre Towles appeals his capital-murder conviction and sentence of death. Towles was convicted of murder made capital for taking the life of Geontae Glass, who was under the age of 14. See § 13A-5-40(a)(15), Ala.Code 1975. By a vote of 11 to 1, the jury recommended that Towles be sentenced to death. The circuit court accepted the jury’s recommendation and sentenced Towles to death.

Facts

On the morning of December 4, 2006, Shalinda Glass arrived at the Conoco gas station on Baltimore Avenue in Albertville. Ronnie Cook, who was at the time at the gas station to complete a sales order, took note of Glass because she drove her Nissan Altima automobile from one side of the lot to the other several times before she parked her vehicle in front of a gas pump. Cook watched Glass and Shaliyah Glass, Glass’s seven-year-old daughter, get out of the vehicle and enter the gas station.
After they entered the Conoco gas station, Cook saw a blue Ford pickup truck stop beside Glass’s Altima. Cook then saw a black male, who had the same general physical characteristics as Towles, get into the Altima and then leave the Conoco gas station in the Altima. Cook did not see the black male get out of the pickup truck, but he stated that the black male was close to the passenger door of the pickup truck when Cook first noticed him. Cook testified that the pickup truck followed the Altima away from the Conoco gas station.
When Glass left the gas station with Shaliyah and found her Altima missing, she used a pay phone to telephone Towles. After Towles failed to answer, Glass telephoned 911. Glass told the emergency dispatcher that her Altima was missing and that her five-year-old son, Geontae, was asleep in the backseat of the vehicle.
The State presented evidence that the blue pickup truck Cook saw belonged to Bobby Spydell. Towles and Spydell had been friends since childhood, and the two men were business partners, operating a barbeque restaurant together. According to Spydell, Towles telephoned Spydell around 2 or 3 a.m. on December 4. Towles told Spydell that he needed Spydell to pick him up in Albertville. Spydell immediate *126 ly left to meet Towles in his Ford pickup truck.
Spydell met Towles at a house in Albert-ville. At Towles’s direction, Spydell drove Towles to a parking lot across the street from the Conoco gas station. Towles then asked Spydell to take him across the street to the Conoco gas station. Once there, Towles got out of the pickup truck, briefly walked away from the pickup truck and returned, throwing cash on the passenger seat for Spydell. Towles then walked toward the entrance of the Conoco gas station, and Spydell drove his pickup truck to his house.
While the search for Geontae and the Altima was ongoing, Investigator J.T. Car-tee of the Albertville Police Department interviewed Glass and Towles. Towles had few details to share with Investigator Cartee at that time. Investigator Cartee subsequently became aware of the involvement of the blue pickup truck. In a second interview with Investigator Cartee, Towles denied any knowledge of a blue pickup truck or of its possible owner.
Alabama State Trooper William Randall, Jr., who was at the time a deputy with the Marshall County Sheriffs Office, participated in a search of Towles’s residence located on Broad Street in Albertville. Towles had consented to the search. During the search, Trooper Randall found a receipt for a utility bill in the name of “Vicki Towles.” The address listed on the receipt was not Broad Street but was a Boaz address on Shady Grove Road. Trooper Randall traveled to the Shady Grove address, secured the residence, and awaited the arrival of deputies with the Etowah County Sheriffs Office.
Etowah County Sheriff Todd Entrekin arrived at the Shady Grove address and entered the residence. Sheriff Entrekin and some of his deputies performed a sweep of the home searching for Geontae. Although he did not find Geontae, Sheriff Entreldn did note that the layout of the residence appeared to match a description given by 'Shaliyah to officers of the house in which she and Geontae had stayed the weekend before Geontae’s alleged kidnapping. Sheriff Entrekin left the residence and returned to the sheriffs office, intending to return with a search warrant for the residence.
While he was at the sheriffs office, Sheriff Entrekin was informed that the missing Altima had been discovered in the garage of the Shady Grove residence. Inside the trunk of the Altima officers found Geontae’s body wrapped in a blanket. Among other items recovered from the backseat of the Altima was a blue-and-white-striped bedsheet with reddish brown stains. Subsequent DNA testing of the stains on the bedsheet by Deborah Dodd, a forensic scientist with the Alabama Department of Forensic Sciences, revealed that the stains matched the DNA profile of Geontae. On the bathtub in the back bathroom of the house, additional reddish brown stains were found. Dodd testified that these stains contained a mixed DNA profile, which is not uncommon for samples recovered in common areas, and that Geontae was most likely a contributor to the sample.
Investigator Mike Jones of the Etowah County Sheriffs Office and Agent Brenn Tallent of the Federal Bureau of Investigation interviewed Towles at the sheriffs office at 3:15 a.m. on December 5, 2006. Towles was made aware of the discovery of Geontae’s body. At the outset of the interview, Towles stated that he was “responsible for what happened to Geontae” and that he did not want Shalinda charged in Geontae’s death. (R. 1693-94.) Towles stated to Investigator Jones that he was outside his residence on Sunday evening when two masked men approached him *127 and demanded that Geontae come outside. Towles agreed to the demand, believing that Geontae would not be harmed because he was a small child. Towles was then asked for money, and he gave them all the money he had, which he approximated at $15,000. Before leaving, one of the masked men took Geontae behind the house and beat him while the other masked man held Towles at gunpoint. Towles took Geontae inside the residence and told him that he would take Geontae to the doctor in the morning if he were not feeling well. Towles did not identify the men to Investigator Jones or Agent Tal-lent.
Several items found in the Shady Grove residence cast doubt on Towles’s statement to Investigator Jones and Agent Tal-lent. Specifically, officers recovered an assault rifle, a pistol, a bulletproof vest, and $33,382.
Dr. Emily Ward, a state medical examiner, performed the autopsy on Geontae. Dr. Ward noted many injuries she considered to be nonlethal. Geontae’s body had abrasions on his arms, back, chest, stomach, groin, buttocks, legs, and left foot, and had bruising on his right thigh and right buttock. In addition to the fresh abrasions, Geontae’s body revealed wounds that had begun healing, indicating to Dr. Ward that these wounds were likely sustained a few days before Geontae’s death. Based on the curved nature of the wounds that had begun healing, Dr. Ward speculated that they had been inflicted with a belt.
Geontae’s body also presented more serious injuries. Incisions to the right buttock and thigh revealed that the muscles had a large accumulation of blood. Dr. Ward explained that the accumulation of blood was significant because it indicated that the injury was “extremely forceful.” (R. 1855.) Further, the muscular damage sustained by Geontae caused an increase of myoglobin in the bloodstream, which Dr. Ward classified as a very toxic substance capable of causing kidney failure. The level of myoglobin in Geontae’s bloodstream was 87 nanograms per milliliter, where a normal level would be less than 5 nanograms per milliliter.
Geontae’s lower back did not appear to have injuries to the skin, indicating that Geontae did not receive a direct blow to that area. However, the force applied to the buttocks was significant enough to cause hemorrhaging that reached Geon-tae’s spinal cord. Based on the level of hemorrhaging in the nerve fibers of the lower portion of the spinal cord, Dr. Ward surmised that Geontae’s injuries resulted in paralyzation. Dr. Ward testified that in her opinion Geontae died of complications from blunt-force injuries but that he could have survived had he received medical attention.
Additionally, a portion of the skin on Geontae’s buttocks was denuded. Dr. Ward testified that the denuded-skin injury was consistent with having been struck with a piece of wood and that she asked investigators to return to the scene and to look for something similar to a piece of wood that may have been used to injure Geontae.
Captain Jeff Hopper of the Etowah County Sheriffs Office was sent to the Shady Grove residence with instructions to look for a solid object two to four inches wide. Captain Hopper located a piece of wood on the property. The piece of wood was approximately four feet long and two inches wide. His attention was drawn to the piece of wood because it bore a reddish brown stain. Dodd performed DNA testing on the stain, determining that the stain was blood and that the bloodstain matched the DNA profile of Geontae.
*128 A search of a book bag recovered from the Altima yielded Geontae’s school-conduct chart for the months of November and December. The chart displayed that Geontae had received a smiley face for the first two weeks of November but that Geontae had received a straight face on the chart’s most recent entry. The State offered Geontae’s conduct assessment as Towles’s motive for killing Geontae.

Standard of Review

Because Towles has been sentenced to death, according to Rule 45A, Ala. R.App. P., this Court must search the record for “plain error.” Rule 45A states:
“In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.”
(Emphasis added.)
In Ex parte Brown, 11 So.3d 933 (Ala.2008), the Alabama Supreme Court explained:
“ ‘ “To rise to the level of plain error, the claimed error must not only seriously affect a defendant’s ‘substantial rights,’ but it must also have an unfair prejudicial impact on the jury’s deliberations.” ’ Ex parte Bryant, 951 So.2d 724, 727 (Ala.2002) (quoting Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998)). In United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the United States Supreme Court, construing the federal plain-error rule, stated:
“ ‘The Rule authorizes the Courts of Appeals to correct only “particularly egregious errors,” United States v. Frady, 456 U.S. 152, 163 (1982), those errors that “seriously affect the fairness, integrity or public reputation of judicial proceedings,” United States v. Atkinson, 297 U.S. [157], at 160 [ (1936) ]. In other words, the plain-error exception to the contemporaneous-objection rule is to be “used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.” United States v. Frady, 456 U.S., at 163, n. 14.’
“See also Ex parte Hodges, 856 So.2d 936, 947-48 (Ala.2003) (recognizing that plain error exists only if failure to recognize the error would ‘seriously affect the fairness or integrity of the judicial proceedings,’ and that the plain-error doctrine is to be ‘used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result’ (internal quotation marks omitted)).”
11 So.3d at 938. “The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal.” See Hall v. State, 820 So.2d 113, 121 (Ala.Crim.App.1999). Although Towles’s failure to object will not bar this Court from reviewing any issue, it will weigh against any claim of prejudice. See Dill v. State, 600 So.2d 343, 352 (Ala.Crim.App.1991).

Discussion

At trial, the State offered the testimony of Shaquille Cameron, Towles’s son. Cameron, who was 15 years old at the time of trial, lived with Towles from the time he was 8 years old until he was 9. Cameron was removed from Towles’s custody by the Alabama Department of Human Resources after Cameron appeared at school with an injury to his head. According to Cameron, Towles became angry with him because *129 Towles found a number of cups under Cameron’s bed. Cameron said that Towles picked up a metal box fan and struck Cameron’s head with the fan. Additionally, Cameron alleged that on other occasions Towles struck him with his fists or with various implements, such as a belt, an extension cord, or a broomstick. Cameron testified that the assaults were in response to disciplinary issues at school. Towles objected to the admission of Cameron’s testimony on the ground that it violated Rule 404(b), Ala. R. Evid. The circuit court overruled Towles’s objection, finding that Cameron’s testimony was relevant and admissible for the limited purpose of proving Towles’s intent. (R.1914.)
On appeal, Towles argues that the admission of Cameron’s testimony, which described acts occurring three years before Geontae’s death, violated Rule 404(b), Ala. R. Evid., because the sole purpose of the testimony was to establish Towles’s bad character. Rule 404(b), provides:
“Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident ....”
Initially, this Court questions whether Cameron’s testimony was properly admissible under any of the well established exceptions to the exclusionary rule. See Moore v. State, 878 So.2d 328, 336 (Ala.Crim.App.2003). However, “[ajssuming, without deciding, that the evidence regarding [Towles’s] involvement in the [physical abuse of Cameron] was, as the [trial court found], relevant to show [intent], pursuant to the trial court’s broad instruction, [the jury] nonetheless remained free to consider that evidence for ... other [improper] purposes (including [motive and identity])....”[1] Ex parte Billups, 86 So.3d 1079, 1087 (Ala.2010).
The circuit court instructed the jury as follows with respect to Cameron’s testimony:
“Ladies and gentlemen, there was testimony during the course of the trial by the young man Shaquille Cameron. And I want to speak to you about that testimony and what weight or how you can use that testimony.
“The Court charges you that there has been testimony in this case of prior bad acts by the defendant. You may not consider this testimony as evidence that the defendant had a bad character or that he acted in conformity with that character on the occasion that is the basis of the present charge; nor may you consider this evidence as proof that the defendant committed the acts alleged in this case.

“You may only consider the evidence of prior acts as evidence of identity or of an intent, purpose or motive to commit the acts complained of in the indictment before you today.”

(R. 2114-15) (emphasis added.) Towles did not object to the circuit court’s jury instructions; thus, this issue will be reviewed for plain error only. See Rule 45A, Ala. R.App. P. (R. 2127.)
In Ex parte Billups, the Alabama Supreme Court held that jury instructions that allow the jury to consider collateral bad acts for implausible purposes amount to plain error.
*130 “ ‘[A]n instruction should advise the jury on the purposes for which prior acts are admitted, meaning uses that are plausible in the .case at hand, and should not include a laundry list of every conceivable use.’ 1 Christopher B. Mueller and Laird C. Kirkpatrick, Federal Evidence § 4:30 at 789 (3d ed.2007) (emphasis added). In this case, however, the jury was allowed to consider the evidence regarding Billups’s involvement in the Avanti East killings for several implausible purposes, including, among others, opportunity and absence of mistake or accident. For example, Billups made no argument at trial that Lockett’s killing was the result of an accident or that he lacked the opportunity to kill Lockett; rather, Billups’s defense was that another person, Charles Cooper, was responsible for Lockett’s murder.
“By simply reciting the complete ‘laundry list’ of permissible theories under Rule 404(b), [Ala. R. Evid.,] the trial court’s instruction in this case gave the jury inadequate guidance. See Ex parte Belisle, 11 So.3d 323, 333 (Ala.2008) (‘[A]n appellate court “presume[s] that the jury follows the trial court’s instructions unless there is evidence to the contrary.” ’ (quoting Cochran v. Ward, 935 So.2d 1169, 1176 (Ala.2006))). The trial court’s instruction also failed to limit the State to the purposes — as nonspecific as they were — that it advanced in support of admission of the evidence regarding Billups’s involvement, in the Avanti East killings. Thus, we conclude that the trial court erred by failing to limit the jury’s consideration of that evidence to only those purposes for which the evidence was purportedly offered by the State (plan, identity, motive, and intent). See Huddleston [v. United States ], [485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988) ]; cf. United States v. Tse, 375 F.3d 148, 158 (1st Cir.2004) (finding that the district court ‘adequately limited the jury’s consideration of [certain Rule 404(b) ] evidence’ when the court instructed the jury that it could not use that evidence ‘to make a propensity inference’ and that the jury could use that evidence to determine only the defendant’s ‘knowledge and intent’).
“With regard to the erroneous jury instruction, we agree with Judge Welch’s conclusions that ‘[t]he confusion of the jury and the probable prejudice to Billups is obvious’ and that ‘the error affected Billups’s substantial rights and ... seriously affected the fairness and integrity of the proceeding against him.’ Billups[ v. State ], 86 So.3d [1032,] 1079 [ (Ala.Crim.App.2009) ] (Welch, J., dissenting). Accordingly, we conclude that, under the particular circumstances of this case, the trial court’s failure to properly instruct the jury regarding the purposes for which it could consider the evidence of Billups’s involvement in the Avanti East killings constituted plain error.”
86 So.3d at 1086. Similarly, in R.C.W. v. State, 168 So.3d 90 (Ala.Crim.App.2012), this Court reversed the appellant’s conviction, holding that “‘the circuit court’s instructions were erroneous because they permitted the jury, over [R.C.W.J’s objection, to consider the collateral-act evidence for purposes not at issue in the case.’ ” R.C.W., 168 So.3d at 98 (quoting Marks v. State, 94 So.3d 409, 413 (Ala.Crim.App.2012)).
Contrary to the circuit court’s instructions, the jury could not properly consider Cameron’s testimony under the identity exception to the exclusionary rule. “[T]he identity exception to the general exclusionary rule of character ... contemplates the situation where the now-charged crime was committed in a novel and pecu *131 liar manner.” Charles W. Gamble and Robert J. Goodwin, McElroy’s Alabama Evidence, § 69.01(8) (6th ed.2009).
“ ‘ “When extrinsic offense evidence is introduced to prove identity, the likeness of the offenses is the crucial consideration. The physical similarity must be such that it marks the offenses as the handiwork of the accused.” ’ Ex parte Baker, 780 So.2d 677, 680 (Ala.2000) (quoting United States v. Clemons, 32 F.3d 1504, 1508 (11th Cir.1994) (further citations omitted)).... ‘ “Much more is demanded than the mere repeated commission of crimes of the same class, such as repeated ... rapes. The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature.” ’ Hurley v. State, 971 So.2d 78, 83 (Ala.Crim.App.2006) (quoting 1 McCormick on Evidence § 190 at 801-03 (4th ed.1992) (footnotes omitted)).”
Moore v. State, 49 So.3d 228, 233 (Ala.Crim.App.2009).
The primary assault to which Cameron testified involved Towles’s use of a metal box fan. The only apparent similarity between the assault Cameron suffered and the manner in which Geontae was killed is that Cameron and Geontae are both Towles’s sons. During the acts at issue, different implements were used by Towles — Cameron was assaulted with a metal box fan and Geontae was killed with a piece of wood; the primary injuries differed — Cameron was struck on his head and Geontae on his buttocks; and the apparent impetus for the beatings was different — Cameron was assaulted for having cups under his bed, whereas the State’s offered motive was that Geontae had a less than satisfactory conduct report from school.[2] In short, there was no showing that the assaults to which Cameron testified and the manner in which Geontae was killed possessed the novelty or peculiarity necessary to render Cameron’s testimony admissible under the identity exception. In fact, the circuit court explicitly recognized that the identity exception was not applicable. See (R.1914-15, 2014-15, 2074-75.) Accordingly, the circuit court erred by allowing the jury to consider Cameron’s testimony for the purpose of establishing Towles’s identity as Geontae’s murderer.
Further, Cameron’s testimony was not properly considered by the jury under the motive exception contained in Rule 404(b), Ala. R. Evid.
“Motive is defined as ‘an inducement, or that which leads or tempts the mind to do or commit the crime charged.’ Spicer v. State, 188 Ala. 9, 11, 65 So. 972, 977 (1914). Motive has also been described as ‘that state of mind which works to “supply the reason that nudges the will and prods the mind to indulge the criminal intent.” ’ [Charles Gamble, Character Evidence: A Comprehensive Approach 42 (1987).]”
Bowden v. State, 538 So.2d 1226, 1235 (Ala.1988).
The State argues on appeal that Cameron’s testimony was admissible, and therefore properly considered by the jury, under the motive exception to the exclusionary rule.[3] Specifically, the State cites *132 Bedsole v. State, 974 So.2d 1034 (Ala.Crim.App.2006), arguing that the assaults on Cameron “tended to show that Towles was motivated to physically beat or assault children for disciplinary problems,” particularly those disciplinary problems that occur at school. (State’s brief, at 22.)
. In Bedsole, this Court held that evidence of similar collateral sex acts with a child was admissible under Rule 404(b), Ala. R. Evid., to prove that the appellant was “motivated by an unnatural sexual desire for young girls.” Bedsole, 974 So.2d at 1038-40; see also Ex parte Register, 680 So.2d 225, 226-28 (Ala.1994); Garner v. State, 977 So.2d 533, 536-38 (Ala.Crim.App.2007). However, the liberal view of the motive exception to Rule 404(b) found in Bedsole, Register, and Gamer has been narrow in application. Alabama courts have not expanded the holdings of these cases beyond the scope of cases involving the sexual abuse of a minor, and we decline to do so today.
Simply stated, there was no logical tendency to lead to any inference that Towles, because he had assaulted his son Cameron three years earlier, was motivated to kill Geontae. Accordingly, the jury should not have been instructed that it could consider Cameron’s testimony as evidence of Towles’s motive.
The circuit court’s instructions were erroneous because they permitted the jury to consider Cameron’s testimony for improper purposes. Given the highly prejudicial nature of collateral acts involving child abuse, this Court holds that the erroneous jury instructions “ ‘affected [Towles’s] substantial rights and ... seriously affected the fairness and integrity of the proceeding against him.’ ” Ex parte Billups, 86 So.3d at 1086 (quoting Billups v. State, 86 So.3d 1032, 1079 (Ala.Crim.App.2009) (Welch, J., dissenting)). Accordingly, this Court concludes that the circuit court’s failure to instruct the jury regarding the proper uses of Cameron’s testimony constituted plain error.

Conclusion

Based on the foregoing, this Court reverses Towles’s conviction and sentence of death and remands this cause for further proceedings.
REVERSED AND REMANDED.
WELCH, J., concurs.
KELLUM, J., concurs in the result, with opinion, joined by JOINER, J. WINDOM, P.J., dissents, with opinion.
BURKE, J., recuses himself.

. During the charge conference, the circuit court appeared to agree with defense counsel that the instructions should reflect that Cameron’s testimony was admitted solely for the limited purpose of proving Towles's intent. (R.2013-15.)

. Cameron testified to other assaults perpetrated by Towles, but his testimony regarding those assaults was too sparse to establish the novelty or peculiarity necessary to make those assaults properly considered under the identity exception.

. Towles has not raised on appeal the issue of the circuit court's jury instructions with respect to Cameron’s testimony. The State’s argument addressed here was raised in response to Towles’s argument on appeal that Cameron's testimony was inadmissible under Rule 404(b), Ala. R. Evid.