WINDOM, Judge.
 

 Preston Louis Moore was convicted of one count of murder made capital because it was committed during the course of a burglary, a violation of § 13A-5-40(a)(4), Ala.Code 1975, and of two counts of attempted murder, violations of §§ 13A-6-2 and 13A-4-2, Ala.Code 1975. Moore was sentenced to life without the possibility of parole for the capital murder conviction and was sentenced as an habitual felony offender to life in prison for each attempted murder conviction.
 

 On the evening of October 14, 2003, Eugene Johnson, Demarious Kirksey, and Donte McGrue were visiting Xerxes Stanford at his home in Oxford that he shared with his 15-year-old daughter, Tatiana Johnson (“Tatiana”), and her infant son. Around 10 p.m., Travokeo Bradford and Delrekus Jernigan arrived and sold Stanford cocaine. Stanford attempted to walk outside with Bradford and was shot in the head as he opened the door. The shooters, Preston Moore and Samuel Kelly, then entered the house. Kirksey, who was in the kitchen at the time, ran down a hallway and hid inside a closet in one of the bedrooms. Tatiana and Johnson were unable to escape. Moore ultimately shot Tatiana in the face and left her bleeding in the living room near her father. After Tatiana was shot, Johnson attempted to run but was gunned down and died in a field across the street from the residence. Johnson died as a result of multiple gunshot wounds.
 

 Tatiana testified she was in the kitchen preparing a bottle for her son when she heard a gunshot, turned around, and saw
 
 *230
 
 Moore coming toward her with a gun. She then ran down a hallway toward her bedroom, entered the room and shut the door. Shortly thereafter, Moore pushed the door open and told her to hurry to the front of the house.
 

 When Tatiana returned to the living room, she saw her father on the floor slumped against the sofa with a gunshot wound to his head. (R. 1099.) Moore then ordered Tatiana onto the front porch where she saw several people, including Johnson. Tatiana testified that while they were on the porch, Moore put the gun to her head and pulled the trigger; however, the gun just “clicked.” (R. 1085.) At that point, Moore ordered Tatiana and Johnson back into the house and told them to get on the floor. Moore then pointed a gun at her, pulled the trigger, and shot her in the face. Tatiana then heard another gunshot and assumed Johnson fell. Tatiana then heard footsteps running out of the house and down the front steps. When she no longer heard anything, she got up, ran to her son’s bedroom, grabbed him, and ran out the back door of the house. She eventually found a neighbor who helped her and telephoned emergency 911.
 

 Demarious Kirksey testified that when Bradford and Jernigan arrived, they went into the kitchen, and Bradford sold Stanford crack cocaine. According to Kirksey, Jernigan was acting very nervous. During the transaction, Stanford asked Bradford if he had any scales to weigh the crack cocaine, and Bradford told him that he had scales in his vehicle. Bradford, Jernigan, and Stanford then headed toward the front door to retrieve the scales. Kirksey said that he then heard a gunshot, looked toward the front door, and saw Kelly come through the front door holding a gun. Kirksey stated that he did not see Moore.
 

 After hearing the gunshot, Kirksey ran down the hall and hid in a closet in one of the bedrooms where he remained until the police arrived. While he was in the closet, he heard Moore’s voice, which he described as distinctive. Kirksey then heard several more gunshots over the next few minutes. Kirksey stated that Moore and Kelly had a problem with Stanford relating to a burglary of Kelly’s grandmother’s house, and that the problem also involved a man with the nickname “Birmingham.” (R. 1440.)
 

 Stanford initially survived the shooting but two years later succumbed to numerous medical complications resulting from the gunshot wound. Roger Phillips, a detective with the Oxford Police Department, testified that he spoke with Stanford in December 2003, approximately two months after the shooting and a little more than two years before Stanford’s death. According to Det. Phillips, Stanford was unable to speak, but he could grunt, make hand gestures, and appeared to understand what was going on around him. Det. Phillips said he showed Stanford two photographic lineups — one included a photograph of Moore and one included a photograph of Kelly — and that he asked Stanford if anyone in the lineups was involved in the shooting. Stanford immediately pointed to the photographs of Moore and Kelly as the shooters.
 

 In addition to the testimony of Tatiana and Kirksey and Stanford’s identification, the State also presented evidence that Moore had previously been convicted in 1993 of first-degree robbery. Specifically, during its case-in-chief, the State called Grady McGlothin, one of the victims of Moore’s prior robbery, who testified regarding the details of the robbery and Moore’s violent actions on that occasion.
 

 In an attempt to establish his innocence,
 
 *231
 
 Moore presented an alibi defense.
 
 [1]
 
 He denied going to the street on which Stanford’s house is located on October 14, 2003 and denied shooting anyone. He testified that he was employed with Willstaffing Unloading Service at the SuperValu grocery store in Oxford, and that he was at work the night of the shooting from approximately 8:00 p.m. until sometime after 5:00 a.m. the following morning.
 

 To buttress his alibi defense, Moore presented the testimony of Ollice Hansford. Hansford, also employed by Willstaffing Unloading Service at the SuperValu in Oxford, stated that he saw Moore when he arrived to work between 7:00 and 8:30 p.m. the night of October 14, 2003, but he did not see him during the rest of his shift, which ended at approximately 7:00 a.m. the next day. Demetrius Holcomb, Moore’s supervisor at the SuperValu, testified that he saw Moore several times throughout the night of October 14, 2003, including initially at approximately 9:00 p.m., and again during their “lunch break” at approximately 1:00 a.m. (R. 1522.)
 

 In rebuttal, the State presented the testimony of Roosevelt Hardy, Jr., Dennis Whiteside, and Larry Champion. Hardy testified that on the night of October 14, 2003, he saw Moore at Jernigan’s house between 9:30 and 10:00 p.m.
 
 [2]
 
 Whiteside, the night-shift manager at the SuperValu, testified that he was working on the night of October 14, 2003, and Moore was not at work. Finally, Champion testified that he supervised the night-shift unloading crew at the SuperValu in Oxford and on the night of October 14, 2003, Moore was not at work.
 

 On appeal, Moore contends that the circuit court erred in allowing the State to present evidence of his 1993 first-degree robbery conviction.
 
 [3]
 
 Specifically, Moore contends that his prior robbery conviction and the facts underlying that conviction were relevant only to show his bad character and thus should have been excluded pursuant to Rule 404(b), Ala. R. Evid.
 
 [4]
 

 Before trial, the State filed notice of its intent to introduce the prior conviction under Rule 404(b). Thereafter, Moore filed a motion for a pretrial determination of the admissibility of the prior conviction and requested a hearing on the matter. At pretrial hearings on February 1, 2007, and March 20, 2007, the circuit court heard arguments and accepted evidence on the admissibility of the prior conviction.
 

 Grady McGlothin, the victim of the pri- or robbery, testified at the pretrial hearing, and later at trial, that in 1992 Moore, Kelly, and three other individuals entered his residence in Anniston and robbed him. At that time, McGlothin was running a “shot house” out of his residence. (R. 210.) On the night of December 11, 1992, there were between 30 and 40 people at his residence including Moore, Kelly, and Lavon Wynn, all of whom were underage and appeared to be intoxicated. McGlothin ordered them to leave. After protesting, the three eventually left but later returned with two others. When they returned, the men were armed with
 
 *232
 
 shotguns and pistols and ordered everyone onto the floor. At some point, Moore held a shotgun to McGlothin’s head and asked, “[w]hose house is this now?” (R. 1489.) McGlothin also testified that during the robbery, Moore shot the jukebox and the ceiling and hit a patron on the back of the head with the butt of a shotgun. Moore and his accomplices took all the cash McGlothin had in the house as well as some alcohol.
 

 After hearing arguments, the circuit court ruled that the prior robbery conviction was admissible under Rule 404(b) to show intent, motive, knowledge, opportunity, preparation, and common plan, scheme, or design exceptions to the exclusionary rule and allowed its admission.
 
 [5]
 
 We disagree.
 

 Rule 404(b), provides:
 

 “Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident....”
 

 The Alabama Supreme Court has “held that the exclusionary rule prevents the State from using evidence of a defendant’s prior bad acts to prove the defendant’s bad character and, thereby, protects the defendant’s right to a fair trial.”
 
 Ex parte Drinkard, 777
 
 So.2d 295, 302 (Ala.2000) (citing
 
 Ex parte Cofer,
 
 440 So.2d 1121, 1123 (Ala.1983)). This court has explained that “[o]n the trial for the alleged commission of a particular crime, evidence of the accused’s having committed another act or crime is not admissible if the only probative function of such evidence is to prove bad character and the accused’s conformity therewith.”
 
 Lewis v. State,
 
 889 So.2d 623, 661 (Ala.Crim.App.2003) (quoting C. Gamble,
 
 McElroy’s Alabama Evidence
 
 § 69.01(1) (5th ed.1996)).
 

 “‘“This exclusionary rule is simply an application of the character rule which forbids the State to prove the accused’s bad character by particular deeds. The basis for the rule lies in the belief that the prejudicial effect of prior crimes will far outweigh any probative value that might be gained from them. Most agree that such evidence of prior crimes has almost an irreversible impact upon the minds, of the jurors.” ’ ”
 

 Ex parte Jackson,
 
 33 So.3d 1279, 1284-1285 (Ala.2009) (quoting
 
 Ex parte Arthur, 472
 
 So.2d 665, 668 (Ala.1985), quoting in turn
 
 McElroy’s
 
 supra, § 69.01(1)).
 

 The State is not prohibited from ever presenting evidence of a defendant’s prior bad acts. This court has stated:
 

 “If the defendant’s commission of another crime or misdeed is an element of guilt, or tends to prove his guilt otherwise than by showing of bad character, then proof of such other act is admissible. [Some] well-established exceptions to the exclusionary rule include: (1) relevancy to prove identity; (2) relevancy to prove res gestae; (3) relevancy to prove scienter; (4) relevancy to prove intent; (5) relevancy to show motive; (6) relevancy to prove system; (7) relevancy to prove malice; (8) relevancy to rebut special defenses; and (9) relevancy in various particular crimes.”
 

 
 *233
 

 Harris v. State,
 
 2 So.3d 880, 907 (Ala.Crim.App.2007) (internal citations and quotations omitted). However, “[f]or collateral-act evidence to be admissible for one of the ‘other purposes’ in Rule 404(b), there must be ‘ “a real and open issue as to one or more of those ‘other purposes.’ ” ’ ”
 
 Draper v. State,
 
 886 So.2d 105, 117 (Ala.Crim.App.2002) (quoting
 
 Gillespie v. State,
 
 549 So.2d 640, 645 (Ala.Crim.App.1989), quoting in turn
 
 Bowden v. State,
 
 538 So.2d 1226, 1227 (Ala.1988)).
 

 The common plan, scheme, or design exception to the exclusionary rule “is essentially coextensive with the identity exception” and must be analyzed under the same standards.
 
 Ex parte Darby,
 
 516 So.2d 786, 789 (Ala.1987). “[T]he plan, scheme, or design exception is an extension of the identity exception — where the charged crime and the collateral crime are committed in the same novel or peculiar manner, evidence of the collateral crime is admissible to identify the defendant as the perpetrator of the charged crime.”
 
 Register v. State,
 
 640 So.2d 3, 6 (Ala.Crim.App.1993). “ ‘When extrinsic offense evidence is introduced to prove identity, the likeness of the offenses is the crucial consideration. The physical similarity must be such that it marks the offenses as the handiwork of the accused.’ ”
 
 Ex parte Baker,
 
 780 So.2d 677, 680 (Ala.2000) (quoting
 
 United States v. Clemons,
 
 32 F.3d 1504, 1508 (11th Cir. 1994) (further citations omitted)). In other words, “ ‘evidence of a prior crime is admissible only when the circumstances surrounding the prior crime and those surrounding the presently charged crime “exhibit such a great degree of similarity that anyone viewing the two offenses would naturally assume them to have been committed by the same person.” ’ ”
 
 Irvin v. State,
 
 940 So.2d 331, 347 (Ala.Crim.App.2005) (quoting
 
 Ex parte Arthur,
 
 472 So.2d 665, 668 (Ala.1985), quoting in turn
 
 Brewer v. State,
 
 440 So.2d 1155, 1161 (Ala.Crim.App.1983)). “‘Under the identity exception [and common plan, scheme, or design exception] to the general exclusionary rule prohibiting the admission of other or collateral crimes as substantive evidence of the guilt of the accused, the prior crime is not relevant to prove identity unless both that and the now-charged crime are “signature crimes” having the accused’s mark and the peculiarly distinctive modus oper-andi so that they may be said to be the work of the same person.’”
 
 Irvin,
 
 940 So.2d at 347 (quoting
 
 Bighames v. State,
 
 440 So.2d 1231, 1233 (Ala.Crim.App.1983)). “ ‘Much more is demanded than the mere repeated commission of crimes of the same class, such as repeated ... rapes. The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature.’ ”
 
 Hurley v. State,
 
 971 So.2d 78, 83 (Ala.Crim.App.2006) (quoting 1
 
 McCormick on Evidence
 
 § 190 at 801-03 (4th ed.1992) (footnotes omitted)). “ ‘[T]he mere prior occurrence of an act similar in its gross features — i.e., the same doer, and the same sort of act, but not necessarily the same mode of acting nor the same sufferer’ ” is insufficient.
 
 Brewer,
 
 440 So.2d at 1162 (quoting 2 J. Wigmore,
 
 Evidence,
 
 § 304 at 251 (Chadbourn rev.1979)).
 

 Applying these principles, this court holds that the circuit court erroneously determined that evidence relating to Moore’s previous robbery conviction was relevant “to show some plan or design, pattern, or scheme of operation.” In this case, the facts underlying the prior robbery and the present crimes are not so similar and unique as to render evidence relating to the robbery admissible as a signature crime. The two crimes had two different motives, i.e., robbery and revenge. (R. 1440, 1589.) Although one person was hit in the head with the butt of a shotgun, no one was shot or otherwise seriously injured during the prior robbery,
 
 *234
 
 while in the present crimes three people were shot, two of whom died as a result. Further, the number of perpetrators and the number of -victims were different. In the prior robbery, Moore was accompanied by four other individuals and held between 30 and 40 people at gunpoint, while in the present crimes, testimony indicated that only Moore and Kelly were involved
 
 [6]
 
 and that there were only five people and one infant in the house at the time of the shooting. Additionally, the length of time involved in the prior and present crimes was different. During the prior robbery, the victims were held at gunpoint for at least two hours, while testimony indicated that the present crimes were completed in only a matter of minutes.
 

 In fact, when explaining the most salient similarities between the two crimes, the prosecutor stated:
 

 “Judge, you know, whether you terrorize somebody by leaving them on the floor for two hours or you shoot up the walls and ceiling and jukebox or you terrorize them by shooting their dad in front of them and then shooting them in the face it’s still a violent act committed by this man, and that’s a distinctive thing in and of itself.”
 

 (R. 284.) However, Moore’s prior violent act was inadmissible to establish his propensity toward violence and thus guilt of the charged violent crime.
 
 See Brewer,
 
 440 So.2d at 1162 (quoting 2 J. Wigmore,
 
 Evidence,
 
 § 304 at 251 (Chadbourn rev. 1979) (“ ‘[T]he mere prior occurrence of an act similar in its gross features — i.e., the same doer, and the same sort of act, but not necessarily the same mode of acting nor the same sufferer’ ” is insufficient.)).
 

 Viewing all of the circumstances of the prior robbery and the present crimes, we cannot say that a reasonable person would naturally assume that both were committed by the same person. The prior robbery and the present crimes were not so unusual and distinctive and were not committed in such a novel and peculiar manner as to justify admission of evidence of the prior robbery pursuant to the common plan, scheme, or design or identity exceptions to the exclusionary rule. Because the facts underlying Moore’s previous robbery conviction were not sufficiently similar to the current crime and because there were no facts arising out of either crime that were so distinct as to mark those crimes as signature crimes, the circuit court erroneously ruled that the prior robbery conviction was admissible to establish “to show some plan or design, pattern, or scheme of operation.” (R. 1487-88, 1711.)
 

 Moreover, under the facts of this case, we cannot say that the erroneous admission of Moore’s prior robbery conviction was harmless beyond a reasonable doubt. Rule 45, Ala. R.App. P.;
 
 Chapman v. California,
 
 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Here, the State not only admitted evidence of Moore’s prior conviction for robbery, it also admitted graphic details of Moore’s actions during the two hours he and his accomplices spent robbing the victim and his guests. Further, absent the inadmissible evidence, only Tatiana’s identification, Stanford’s out-of-court identification, and Kirksey’s voice identification of Moore linked Moore to the shootings. Moore, on the other hand, presented alibi witnesses who testified that he was at work at the time of the shootings. Although the State presented a strong case of guilt, this court cannot say that the State’s evidence was so overwhelming as to render the improper ad
 
 *235
 
 mission of Moore’s prior conviction harmless beyond a reasonable doubt.
 

 Because evidence relating to Moore’s prior robbery conviction may have contributed to the jury’s verdict, we conclude that the error adversely affected Moore’s substantial rights and thus was not harmless. Accordingly, the judgment of the circuit court is reversed, and this cause remanded for proceedings consistent with this opinion.
 

 REVERSED AND REMANDED.
 

 WELCH and MAIN, JJ., concur. WISE, P.J., and KELLUM, J., concur in the result.
 

 [1]
 

 . According to Moore, he did not participate in the crime. However, Moore stated that Kelly admitted to him that he shot Stanford and a man with the nickname “Birmingham” because they had broken into his house and stolen his drugs. (R. 1589.)
 

 [2]
 

 . Jernigan was one of the individuals who went to Stanford's house to sell Stanford drugs, and who was accompanying Stanford outside when Stanford was shot in the head.
 

 [3]
 

 . The robbery actually occurred in 1992; however, Moore was not convicted until 1993.
 

 [4]
 

 . Moore raises seven issues: however, because of our disposition of this case, this court only addresses one.
 

 [5]
 

 . Although the circuit court determined that die evidence relating to Moore’s prior robbery conviction was admissible to show intent, motive, knowledge, opportunity, preparation, and common plan, scheme, or design, the circuit court instructed the jury it could consider the evidence of the prior robbery only “to show some plan or design, pattern, or scheme of operation.” (R. 1487-88, 1711.)
 

 [6]
 

 . Although Tatiana testified that she believed that more people were involved, no evidence was presented of anyone else’s involvement.