KELLUM, Judge.
Derrick Shawn Penn was convicted of four counts of capital murder in connection with the murders of his wife, Janet Penn, and her boyfriend, Demetrius Powe. Specifically, Penn was convicted of: (1) the intentional murder of two individuals during one act or pursuant to one scheme or course of conduct, see § 13A-5-40(a)(10), Ala.Code 1975 (CC-2011-510); (2) the intentional murder of Janet during the course of a burglary, see § 13A-5-40(a)(4), Ala.Code 1975 (CC-2011-510); (3) the intentional murder of Powe during the course of a burglary, see § 13A-5-40(a)(4), Ala.Code 1975 (CC-2011-511); and (4) and the murder of two individuals during one act or pursuant to one scheme or course of conduct, see § 13A-5-10(a)(10), Ala.Code 1975 (CC-2011-511).[1] By a vote of 10-2, the jury recommended that Penn be sentenced to death for intentionally murdering two individuals during one act or pursuant to one scheme or course of conduct as charged in count one of the indictment in CC-2011-511, and, by a vote of 12-0, the jury recommended that Penn be sentenced to death for the remaining three counts of the indictment. The circuit court followed the jury’s recommendation and sentenced Penn to death. This appeal followed.
The evidence presented at trial indicated the following. In 2007, Janet moved out of a house located on Pages Lane that she was sharing with Penn, her husband, and into an apartment on Eagle Drive in Mobile. Janet’s daughter Kiarra Corley lived in the Eagle Drive apartment with Janet. In 2009, Janet began dating Powe. Thereafter, Penn started telephoning Janet, telling her that she was still his wife and that “he was going to get her and Demetrius; they was [sic] going to get what they deserved.” (R. 678-79.) During this time Penn also began following Janet and would tell Janet that she was going to make Penn kill her and Powe. On May 19, 2009, Janet filed a petition for protection from abuse. In the petition Janet asserted that Penn had threatened to injure her and that he had been coming to her apartment and her *109 place of employment. A judge signed an order scheduling a hearing on Janet’s petition for June 5, 2009.
On the morning of May 25, 2009, Penn went to Greer’s grocery store in Mobile where Powe was working as a stockman. Penn walked up to Powe “and told him to stop messing with his wife” and told him that he was going to Mil Powe. (R. 926.) When Penn reached under his shirt, another employee of Greer’s screamed and dialed emergency 911; Penn left the store before the police arrived. Also on that day Penn spent time worMng on a car owned by Janet’s nephew Kenny Beckham. Penn told Beckham that when he “caught up” with Powe “he was going to fuck them up.” (R. 996.) Beckham tried to change the conversation but Penn continued to talk about what he was going to do to Powe.
On the evening of May 26, 2009, Penn began telephoning Janet’s apartment and leaving messages on her answering machine threatening Janet and Powe. That night Janet and Powe went to bed in one of the upstairs bedrooms in her apartment; Corley was in the other bedroom. Around 1:00 a.m. on May 27, 2009, Penn began ringing the doorbell and beating on the door of Janet’s apartment. Janet went downstairs and Corley heard her scream. Corley ran downstairs’ where she saw Penn gripping Janet in a choke hold and pointing a pistol at her head. Corley grabbed a cordless telephone in the living room, dialed emergency 911, and then threw the telephone at Penn. Janet broke away from Penn, who fired a shot at Janet; the shot missed her. Janet ran into the bathroom and shut the bathroom door behind her. Penn kicked the bathroom door in and fired another shot at Janet. ■ Corléy rah out- of the apartment.
In the upstairs bedroom Powe picked up a telephone, dialed emergency 911,[2] and reported that Penn was shooting inside the apartment. Penn entered the bedroom and beat Powe with his gun, which had jammed.
. Corley ran .to the street outside the apartment, where she saw Officer Adam Partridge of the Mobile Police Department patrolling in the area. Corley approached Partridge’s patrol car, began screaming, and told Partridge that her mother had just been shot and that Penn was still inside the apartment. Partridge called-for backup and waited until Officer .'Josh Evans arrived. Partridge watched the front door of the apartment while Evans moved toward the back of the apartment. As Evans walked around the back corner of the apartment, Penn came out of the back door. Penn was holding a bloody pistol and had a bloody sock on one of his hands. Evans, yelled for Penn to show his hands and Penn dropped his gun. Partridge ran to the back of the apartment and handcuffed Penn. After taking Penn into custody, -Partridge and Evans entered the apartment where they found Janet, unresponsive and lying “face-down in the living room in a pool of blood.” (R. 802.) In the upstairs bedroom the officers found Powe, whose “head was wide open.” (R. 802.) Janet was transported to a hospital, where she was pronounced dead.
Officers transported Penn to the Mobile Police Department headquarters. Before being taken into an interview room, Penn began make spontaneous statements indicating that he had intended to shoot Powe but that Janet had been shot when she got in his way. Officer Bezell Westbrook, Jr., *110 advised Penn of his Miranda[3] rights, and Penn continued making spontaneous statements, this time indicating, that, after he had shot Janet, he chased Powe “up the stairs firing shots.” (R. 818.) In another spontaneous statement, Penn next denied any involvement in the incident and stated that he would receive a sentence of between 10 to 20 years’ imprisonment. Penn further stated that he was going to plead not guilty by reason of insanity and that he had wanted the officers to kill him when they took him into custody. Penn also told the officers that he had taken a large number of pills before going to the apartment and that the pills “had his mind messed up.” (R. 837.) After Penn was taken into an interview room and re-advised of his Miranda rights, he invoked his right to counsel.
Dr. John Krolikowski of the Alabama Department of Forensic Sciences performed the autopsies on Janet and Powe. Dr. Krolikowski testified that Janet had suffered two gunshot wounds. One bullet had entered her back and lacerated her aorta. Another bullet had entered her abdomen and lodged in her hip. Dr. Kroli-kowski determined that the cause of Janet’s death was multiple gunshot wounds and that the manner of her death was homicide. Dr. Krolikowski also testified that Powe had suffered “substantial trauma to his face and brain.” (R. 912.) According to Dr. .Krolikowski, the cause of Powe’s death was multiple blunt trauma and the manner of his death was homicide.
Timothy McSpadden, a forensic scientist with the Alabama Department of Forensic Sciences, testified that the bullet retrieved from Janet’s body had been fired from the .40 caliber pistol recovered when Penn was arrested. ■ McSpadden also testified that the gun Penn used in the murders jammed every time it was fired. Patrick Goff, another forensic scientist with the Department of Forensic Sciences, determined that Powe’s blood was on the .40 caliber pistol and the sock Penn had on his hand when he was apprehended.
Penn presented a multi-faceted defense at trial. He argued that he had acted with heat of passion when he discovered that Powe was in Janet’s apartment. Penn also asserted that he was intoxicated when he committed the crime. Penn further contended that he had not intended to commit a burglary because Janet had allowed him into the apartment.
“Rule 45A, Ala. R.App. P., provides:
“‘In all eases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.’
“As this Court explained in Hall v. State, 820 So.2d 113 (Ala.Crim.App.1999), aff'd, 820 So.2d 152 (Ala.2001):
“‘As is the case with every death penalty case, this court is obliged, pursuant to Rule 45A, Ala. R.App. P., to review the transcript of the proceedings for plain error, whether or not the. issue was raised before the trial court or on appeal. Plain error is defined as error that has “adversely affected the substantial right of the appellant.” The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court *111 or on appeal. As the United States Supreme Court stated in United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the plain-error- doctrine applies only if the error is “particularly egregious” and if.it “seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.” See Ex parte Price, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999); Burgess v. State, 723 So.2d 742 (Ala.Cr.App.1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999); Johnson v. State, 620 So.2d 679, 701 (Ala.Cr.App.1992), rev’d oh other grounds, 620 So.2d 709 (Ala.1993), on remand, 620 So.2d 714 (Aa.Cr.App.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993).’
“820 So.2d at 121-22. ‘To rise to the level of plain error, the claimed error must not only seriously affect a defendant’s “substantial rights,” but it must also have an unfair prejudicial impact on the jury’s deliberations.’ Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998), aff'd, 778 So.2d 237 (Ala.2000).”
McKinnis v. State, 99 So.3d 1265, 1270 (Ala.Crim.App.2012).
In reviewing the record in accordance with our duty under Rule 45A, Aa. R.App. P., we have found plain error that requires the reversal of Penn’s convictions and sentence. .
Before opening statements, the State requested a -pre-trial ruling on the admissibility of State’s exhibit 9, a collection of documents associated with the petition for protection from abuse Janet completed on May 19, 2009. In the petition Janet stated that Penn “came to [her] door beating and [cursing,] - yelling to [sic] the top of his voice” and that she feared further abuse because he, would not stop coming to her apartment and her place of employment. (C. 254.) The State informed the circuit court that it sought
“to introduce evidence that Janet Penn, the victim in tins case, filed a [sic] protection from abuse paperwork and received — against the .Defendant, Derrick Shawn Penn,, on May 18th of 2009, and that the hearing by the court was set on June 5th, 2009,, but was cancelled — as is stated in the record, was abated by death, her death.”
(R. 621.)
The circuit court inquired whether the exhibit was being offered “in the nature of maybe [Rule] 404(b)[, Aa. R. Evid., evidence] and to show motive, plan, scheme, design and so forth.” (R. 621.) The prosecutor stated that it was and further informed the circuit court:
“Due to the close proximity in time frame to the events that occurred, that the murder occurred during the timé period between which [Janet] filed the petition and the petition was going to be heard in court, and that is' the only limited purpose that we’re offering under [Rule] 404 — .”
(R. 621-22.)
Penn objected to the admission of the exhibit on the grounds that it constituted double hearsay and that the State had failed to inform Penn that it intended to introduce any evidence pursuant to Rule 404(b), Aa. R. Evid. The circuit court stated that it would admit the document but that the court would “give a limiting instruction to the jury to consider it for the purposes for which it is introduced and not for the purposes to prove .guilt or innocence of the charges alleged in the indictment.” (R. 623.)
When the State offered the exhibit into evidence, Penn renewed his objection. The circuit court overruled the objection and instructed the jury as follows:
*112 “Okay. Ladies and gentlemen, I am going to give you what is called a limited [sic] instruction at this time and I’ll do it again when I charge you as to the law in this case. This Defendant is charged in two indictments with two counts of capital murder. This evidence is being offered for the limited purpose of proving either motive, plan, design, scheme, intent, and cannot be used to prove the guilt or innocence of the Defendant for the alleged crimes that appear in the indictments. But it goes towards [sic] those other matters that I just explained to you. And, of course, this evidence should be considered along with all of the other evidence in this case.
“I will go over that a little bit more with you at the end of this case. Okay?”
(R. 936.)
While charging the jury at the conclusion of the guilt phase, the circuit court gave the following instruction:
“Now, generally, prior statements, acts or occurrences cannot be used as substantive evidence to establish the guilt of an accused as to the crimes for which he stands — in this case, capital murder and maybe appropriate lesser-included offenses. However, this general principle is subject to well-established exceptions. The State introduced evidence that the victim, Janet Penn, had obtained a court-ordered restraining order on May 19th, 2009. This evidence was allowed for the limited purpose to show or prove either: One, identity; or, two, motive; three, plan, scheme or design; four, intent; or, five, malice, among other exceptions that may exist.”
(R. 1247-48) (emphasis added).
In Ex parte Billups, 86 So.3d 1079 (Ala.2010), the Alabama Supreme Court addressed whether the trial court committed plain error when the court merely recited a “laundry list” of Rule 404(b), Ala. R. Evid., exceptions for admitting evidence of collateral bad acts in instructing the jury on the purpose for which Rule 404(b) evidence was admitted at trial. The trial court in Ex parte Billups admitted evidence indicating that, three days after the offense for which he was being tried, the defendant had been involved in the capital murders of four men. During the testimony of one eyewitness to the four collateral murders, the trial court gave the jury the following instructions:
“ ‘Ladies and gentlemen, let me tell you one thing about this testimony. You’re hearing testimony today about another incident that allegedly occurred, not the same one that Mr. Billups is actually charged with in this case.
“‘The law is clear that evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action and conformity therewith. In other words, evidence of other crimes allegedly committed by the defendant cannot be used to show bad character.
“‘The evidence being presented regarding other acts allegedly committed by the defendant can be considered by you only for the purpose of determining either motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
“ ‘I’m going to repeat those for you. But if you think the evidence from the other case is relevant to the issues of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident in Stevon Lockett’s death, then you can consider this evidence.
“ ‘But it cannot be used by you for any other purpose; all right?’ ”
Ex parte Billups, 86 So.3d at 1082.
In its final jury instructions, the trial court in Billups charged the jury as follows:
*113 “ ‘Now, as I instructed you during the trial, there’s been some testimony regarding an allegation of other crimes. Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action and conformity therewith. In other words, evidence of the other crimes allegedly committed by the defendant cannot be used to show bad character. It cannot be used to show bad character. The evidence being presented regarding other acts allegedly committed by the defendant can be considered by you only for the purpose of determining motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, as I have instructed you. If you think the evidence from the other case is relevant to the issues of motive, opportunity, intent, preparation, plan, knowledge, identity, or . absence of mistake or accident in Stevon Lockett’s death, then you can consider it. But it cannot be used by you for any other purpose.’ ”

Id.

The Alabama Supreme Court concluded that the trial court committed plain error in failing “to properly instruct the jury regarding the purposes for which it could consider the evidence of Billups’s involvement in [prior bad acts].” Ex parte Billups, 86 So.3d at 1086. The Supreme Court explained:
“In Moore v. State, 49 So.3d 228 (Ala.Crim.App.2009), the Court of Criminal Appeals stated the following regarding Rule 404(b), Ala. R. Evid., which addresses the admissibility of evidence of collateral bad acts:
“ ‘Rule 404(b), provides:
. “ ‘ “Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident...
“ ‘The Alabama Supreme Court has “held that the exclusionary rule prevents the State from using evidence of a defendant’s prior bad acts to prove the defendant’s bad character and, thereby, protects the defendant’s right to a fair trial,” Ex parte Drinkard, 777 So.2d 295, 302 (Ala.2000) (citing Ex parte Cofer, 440 So.2d 1121, 1123 (Ala.1983)). This court has explained that “[o]n the trial for the alleged commission of a particular crime, evidence of the accused’s having committed another act or crime is not admissible if the only probative function of such evidence is to prove bad character and the accused’s conformity therewith.” Lewis v. State, 889 So.2d 623, 661 (Ala.Crim.App.2003) (quoting C. Gamble, McElroy’s Alabama Evidence § 69.01(1) (5th ed.1996)).
“ ‘ “ ‘ “This exclusionary rule is simply an application of the character rule which forbids the State to •prove the accused’s bad character by particular deeds. The basis for the rule lies in the belief that the prejudicial effect of prior crimes will far outweigh any probative value that might be gained from them. Most agree that such evidence of .prior crimes has almost an irreversible impact, upon the minds of the jurors.” ’ ”
“ ‘Ex parte Jackson, 33 So.3d 1279, 1284-85 (Ala.2009) (quoting Ex parte Arthur, 472 So.2d 665, 668 (Ala.1985), quoting in turn C. Gamble, McElroy’s supra, § 69.01(1)).’
*114 “49 So.3d at 232 (emphasis added). We farther note that ‘ “Rule 404(b) is a principle of limited ,admissibility,., This means that the offered evidence is inadmissible for one broad, impermissible purpose, but is admissible for one or more other limited purposes Taylor v. State, 808 So.2d 1148, 1165 (Ala.Crim.App.2000) (quoting C. Gamble, McElroy’s Alabama Evidence § 69.01(1) (5th ed.1996) (emphasis added)).”
86 So.3d at 1084.
The court further explained:
“‘[A limiting] instruction [regarding prior-bad-act evidence admitted under Rule 404(b), Ala! R. Evid.,] should advise the jury on the purposes for which prior acts are admitted, meaning uses that are plausible in- the 'case at hand, and should not include a laundry list of every conceivable rise.’ 1 Christopher B. Mueller and Laird C. Kirkpatrick, Federal Evidence § 4:30 at 789 (3d ed.2007) (emphasis added). In this case, however, the jury was allowed to consider the evidence -regarding Billups’s involvement in the Avanti East killings for Several implausible purposes, including, among others, opportunity and absence of mistake-or accident. For example, Billups made no argument, at trial that Lockett’s Mlling was the result of an accident or that he lacked the opportunity to kill Lockett; rather, Billups’s" defense was that another person, Charles Cooper, was responsible for Lockett’s murder.
“By simply reciting the complete ‘laundry list’ of permissible theories under Rule 404(b), [Ala. R-. Evid.,] the trial court’s instruction in this case gave the jury inadequate guidance. See Ex parte Belisle, 11 So.3d 323, 333 (Ala.2008) (‘[A]n appellate court “presume[s] that the jury follows the trial court’s instructions unless there is evidence to the contrary.” ’ (quoting Cochran v. Ward, 935 So.2d 1169, 1176 (Ala.2006))). The trial court’s instruction also failed to limit the State to the purposes — as nonspecific as. they were — that it advanced in support of admission of the evidence regarding Billups’s involvement in the Avanti East killings. Thus, we conclude that the trial court erred by failing to limit the jury’s consideration of that evidence to only those purposes for which the evidence was purportedly offered by the State (plan, identity, motive, and intent). See Huddleston [v. United States, 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988) ]; cf. United States v. Tse, 375 F.3d 148, 158 (1st Cir.2004) (finding that the district court ‘adequately limited the jury’s consideration of [certain Rule 404(b) ] evidence’ when the court - instructed the jury that it could not use that evidence ‘to make a propensity inference’ and that the jury could use that evidence to determine only the defendant’s ‘knowledge and intent’).”
86 So.3d at 1086 (footnotes omitted).
In White v. State, 179 So.3d 170, 188 (Ala.Crim.App.2013), this Court relied on Ex parte Billups in concluding that the circuit court had properly limited the jury’s consideration of Rule 404(b) evidence to the purpose of proving identity. There, the circuit court had instructed the jury that the evidence was “legally admissible as proof of identity”; it did not allow the jury to consider White’s prior bad acts for all purposes listed in Rule 404(b). White, 179 So.3d at 189.
In the instant case, just as in Ex parte Billups, the circuit court gave the jury inadequate guidance when it instruct ed them on the purposes for which they could consider State’s exhibit 9. During pretrial discussion the State agreed with the circuit court’s suggestion that it was offering the exhibit under Rule 404(b), Ala. R. Evid. “to show motive, plan, scheme, *115 design, and so forth.” (R.. 621.) As noted above, when admitting the exhibit at trial, the circuit court instructed the jury that the exhibit was being offered to prove “either motive, plan, design, scheme, [or] intent.” (R. 936.) In charging the jury at the close of the case, the circuit court repeated those reasons but added identity and malice and told the jury that “other exceptions ... may exist.” (R. 1248.) The record indicates that several of the specific purposes given by the circuit court were irrelevant to Penn’s case.
.“Contrary to the circuit court’s instructions, the jury could not properly consider [Pennj’s testimony under the ..identity exception to the exclusionary rule. ‘[T]he identity exception to the general exclusionary rule.of character ... contemplates the situation where the now-charged crime was committed in a novel and peculiar manner.’ Charles W. Gamble and Robert J. Goodwin, McElroy’s Alabama Evidence, § 69.01(8) (6th ed.2009).
“‘“‘When extrinsic offense evidence is introduced to prove identity, the likeness of the offenses is the crucial consideration. The physical similarity must be such that it marks the offenses as the .handiwork of the accused.’” Ex parte Baker, 780 So.2d 677, 680 (Ala.2000) (quoting United States v. Clemons, 32 F.3d 1504, 1508 (11th Cir.1994) (further citations, omitted)) .... “ ‘Much more is demanded than the mere repeated commission of crimes of the same class, such as repeated ... rapes. The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature.”’ Hurley v. State, 971 So.2d 78, 83 (Ala.Crim.App.2006) (quoting 1 McCormick on Evidence § 190 at 801-03 (4th ed.1992) (footnotes omitted)).’
“Moore v. State, 49 So.3d 228, 233 (Ala.Crim.App.2009).”
Towles v. State, 168 So.3d 124, 131 (Ala.Crim.App.2013).
The murders with which Penn was charged were not committed in a novel or peculiar manner. Moreover, Penn’s identity was never an issue in his'trial. Indeed, during closing argument defense counsel stated: •
“[Penn] put himself' in a bad situation and that bad situation left us to be dealing with this right now. He shouldn’t have been there in that situation, but he was, and it all went bad. But I submit to you that" he did hot come to that house with the intent to burglarize it, nor did he have the intent to kill Janet Penn. It went bad, and we got'these results.”
(R. 1213.)
Because Penn’s identity was not án issue, the exhibit could not have been offered to prove a common plan, scheme, or design.
We have stated:
‘“[T]he plan, scheme, or design exception is an'extension of the identity exception — where the charged crime and the collateral crime are committed in the same novel or peculiar manner, evidence of the collateral crime is admissible to identify the defendant as the perpetrator of the charged crime.’ Register v. State, 640 So.2d 3, 6 (Ala.Crim.App.1993). See also Ex parte Darby, 516 So.2d 786, 789 (Ala.1987)(the common scheme or plan exception has been held to be ‘coextensive with the identity exception’). The circumstances of the charged crime and the. collateral crime must ‘exhibit such a great degree of similarity that anyone viewing the two offenses would naturally assume them to have been committed by-the same per *116 son.’ Brewer v. State, 440 So.2d 1155, 1161 (Ala.Crim.App.1983).”
McClain v. State, 26 So.3d 491, 493-94 (Ala.Crim.App.2009).
The circuit court’s instructions were erroneous because they permitted the jury to consider the petition for protection from abuse for improper purposes. Given the highly prejudicial nature of collateral acts involving domestic violence, we conclude that the erroneous jury instructions “ ‘affected [Penn’s] substantial rights and ... seriously affected the fairness and integrity of the proceeding against him.’ ” Ex parte Billups, 86 So.3d at 1086 (quoting Billups v. State, 86 So.3d 1032, 1079 (Ala.Crim.App.2009) (Welch, J., dissenting)). Accordingly, this Court concludes that the circuit court’s failure to instruct the jury regarding the proper uses of State’s exhibit 9 constituted plain error.
Moreover, we cannot say that the circuit court’s error in this case was harmless. It is well settled that the harmless-error rule applies in capital cases. Ex parte Whisenhant, 482 So.2d 1241 (Ala.1983); Henderson v. State, 583 So.2d 276 (Ala.Crim.App.1990), aff'd, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992); Musgrove v. State, 519 So.2d 565 (Ala.Crim.App.), aff'd, 519 So.2d 586 (Ala.1986), cert. denied, 486 U.S. 1036, 108 S.Ct. 2024, 100 L.Ed.2d 611 (1988). The harmless-error rule provides:
“No judgment may be reversed or set aside ... on the ground of misdirection of the jury, the giving or refusal of special charges or the improper admission or rejection of evidence, nor for error as to any matter of pleading or procedure, unless in the opinion of the court to which the appeal is taken or application is made, after examination of the entire cause, it should appear that the error complained of has probably injuriously affected substantial rights of the parties.”
Rule 45, Ala. R.App. P. “The harmless error rule is to be applied with extreme caution in capital cases.” Ex parte Whisenhant, 482 So.2d 1247, 1249 (Ala.1984) (citing Seibold v. State, 287 Ala. 549, 253 So.2d 302 (1970)).
We recently instructed:
“In Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the United States Supreme Court held that before a court’s error in violating certain constitutional rights can be held harmless, the appellate court must be able to declare that the error was harmless beyond a reasonable doubt. In Ex parte Crymes, 630 So.2d 125 (Ala.1993), the Alabama Supreme Court explained:
“‘In determining whether the admission of improper testimony is reversible error, this Court has stated that the reviewing court must determine whether the “improper admission of the evidence ... might have adversely affected the defendant’s right to a fair trial,” and before the reviewing court can-affirm a judgment based upon the “harmless error” rule, that court must find conclusively that the trial court’s error did not affect the outcome of the trial or otherwise prejudice a substantial right of the defendant.’
“630 So.2d at 126. See also Ex parte Greathouse, 624 So.2d 208, 210 (Ala.1993) (holding that the proper harmless-error inquiry asks, absent the improperly introduced evidence, ‘is it clear beyond reasonable doubt that the jury would have returned a verdict of guilty’).”
Trimble v. State, 157 So.3d 1001, 1005 (Ala.Crim.App.2014).
*117 Under the particular facts and circumstances of this case, the failure of the circuit court to properly limit the jury’s consideration of State’s exhibit 9 prejudiced Penn to the point of calling into question the validity of his convictions for four counts of capital murder. The circuit court’s instructions to the jury in the instant case allowed the jury to consider evidence indicating that Janet filed a petition for protection from abuse against Penn without limiting the scope of the jury’s consideration of that evidence. Not only did the circuit court recite a “laundry list” of reasons for which the evidence could be considered, it further instructed the jury that there were “other exceptions that may exist.” (R. 1248.)
In its closing argument to the jury, the State did not argue that State’s exhibit 9 established Penn’s motive, plan, design, scheme, or intent. Rather, it primarily used the exhibit to establish what Janet had been thinking before the murders. Specifically, the prosecutor argued that the exhibit supported the State’s position that Penn had entered or remained unlawfully in Janet’s apartment, telling the jury:
“An important point to point out, that weeks before the murder [Janet] had filed a protection from abuse order, weeks before, because she didn’t want [Penn] around her, in her apartment, anywhere near her.”
(R. 1179; emphasis added.)
The prosecutor later referred to .the same exhibit to argue that “[Janet] was trying to get away from [Penn]. She filed a protection from abuse order. She had moved on with her life and been out two years away from him.” (R. 1183.) Still later the prosecutor said, “[Janet] went to the court to get a protection from abuse order to get away from [Penn] and [Penn] violated that.”[4] (R. 1192.)
During rebuttal argument, the prosecutor again brought up the petition-for-protection-from-abuse form, telling the jury:
“In fact, [Janet] had gone and gotten a PFA. You have the evidence, you will have the certified copy of the protection from abuse order, that’s what the PFA is, showing that on the 19th, six days before this, she had gone and said enough is enough, he has got to leave me alone.”
(R. 1227.)
Also during rebuttal argument the prosecutor asked, “Why did. Janet Penn get the protection from abuse order? Not only was she done with Derrick Penn, she didn’t' want to have anything else to do with him, she had moved on, she had a new boyfriend.” (R. 1229.)
The prosecutor did not argue that the exhibit satisfied any of the Rule 404(b), Ala. R. Evid., purposes as applied to Penn. Rather, the State used the exhibit to demonstrate that Janet was trying to completely sever her relationship with Penn and why she was doing so. The circuit court’s instructions regarding the exhibit did not limit the jury’s consideration of the exhibit to the narrow purposes for which it had been offered and used. To the contrary, the instructions invited the jury to use the exhibit for any purpose, without limitation. Because ‘we cannot conclude that the circuit court’s error did not affect the outcome of Penn’s trial, we are unable to say that the error was harmless.
Based on the foregoing, we conclude that the circuit court’s failure to properly instruct the jury regarding the purposes *118 for which it could consider State’s exhibit 9 resulted in a violation of Penn’s substantial rights and constituted plain error.[5] Therefore, we must reverse Pehn’s convictions and remand this cause for a new trial.
Because we are reversing Penn’s convictions based on this guilt-phase issue, we need not address the remaining guilt-phase issues or the penalty-phase issues. We note, however, that, on May 27, 2014, the United States Supreme Court released its opinion in Hall v. Florida, — U.S. -, 134 S.Ct. 1986, 188 L.Ed.2d 1007 (2014), holding unconstitutional a Florida law dictating that criminal defendants whose IQ scores are 70 or below could not be executed but denying defendants with slightly higher scores any ability to argue that they are too intellectually limited to constitutionally be put to death. We note that the Supreme Court’s opinion in Hall could impact subsequent proceedings in this case, given that Penn has raised a similar issue in this appeal, which, for the reasons stated above, we do not address.
REVERSED AND REMANDED.
WELCH, BURKE, and JOINER, JJ., concur.
WINDOM, P.J., recuses herself.

. Penn argues, and the State concedes, that Penn should not have been convicted of two counts of violating § 13A-5-40(a)(10), Ala. Code 1975, because the convictions did not contain separate elements and were not separate offenses. Given our reversal of Penn's convictions on other grounds, we need not address this issue at this time.

. Because Corley had dialed 911 before throwing the living-room telephone at Penn, the 911 operator was already on the line when Powe picked up the telephone. The recording of that 911 call Was introduced as State’s exhibit 3.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. The record demonstrates that no court ever issued an order in response to Janet’s filing of the petition. The record does not indicate that Penn knew that Janet had filed the petition.

. Given the reversal of Penn’s convictions and sentences based on a plain-error review of State’s exhibit 9, we need not address Penn’s contentions that the exhibit constituted inadmissible hearsay and violated Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).